**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**THE UNITED STATES OF AMERICA**

               v.                    20 Cr. 160 (MKV)

**RICK DANE, JR.,**

        Defendant.

---

**To:  The Honorable Mary Kay Vyskocil**

# DEFENDANT SENTENCING MEMORANDUM

**August 26, 2022**

**Calvin H. Scholar**
**The C.H. Scholar Law Firm, P.L.L.C.**
**225 Broadway-Suite 715**
**New York, New York 10007**
**(212) 323-6922 Telephone**

**Attorneys for Rick Dane, Jr.**

There are four fundamental truths to the case of Rick Dane, Jr.  First, Mr. Dane's life has been a story of overcoming obstacles and continuing to find a way to thrive.  Second, Mr. Dane's life has involved helping people and trying to help horses who have meant so much to his life.  Third, Mr. Dane did not hesitate to accept responsibility for his involvement in the crime.  Fourth, the instant crime is an aberration for Mr. Dane.  It is at the intersection of those four fundamental truths that the Court must craft a sentence that is sufficient, but not greater than necessary.  18 U.S.C. §3553(a).

Mr. Dane appeared before Your Honor and pleaded guilty pursuant to 21 U.S.C. §§ 331 and 333(a)(2), and 18 U.S.C. § 2 with the intent to defraud and mislead, in interstate commerce, adulterated and misbranded drugs, and causing the adulteration and misbranding of drugs, he misled and deceived state and federal drug regulators with respect to the distribution, purchase, and receipt of various misbranded and adulterated performance enhancing drugs, and the use of such misbranded and adulterated drugs to improve the performance of thoroughbred racehorses under his and others' custody and care.  However, even before pleading guilty, Mr. Dane had accepted responsibility as demonstrated by his actions: abiding by all of the conditions of his release, and continuing to work diligently.

The defense submits that the challenge of Mr. Dane's case is to mete out a sentence that is sufficient, but not greater than necessary to satisfy the ends of justice.  The defense would urge this Court to consider the total bent of Mr. Dane's life.  Mr. Dane's life, family responsibility, and hard work—the sum total of his unique history and characteristics—warrant a sentence below the advisory guidelines.  The defense would respectfully urge this Court to impose a sentence of probation or a sentence without incarceration.  The defense submits this sentencing submission in hope that this document as well as the letters from Mr. Dane's friends and family will provide Your Honor with a snapshot of his life.

## Background

It was getting late.  A young Rick Dane was in his bedroom, trying to sleep, but all he could think about was his father coming home drunk again.  Sure enough, a few minutes later Rick heard his father, struggling with the keys at the front door, then barreling through the house, trying to make it to his bed before ultimately passing out on the couch or on the floor somewhere.  Rick pulled the covers up over his head, trying to shield himself from the noise. All he kept telling himself was tomorrow, after school, he would go down to the racetrack and see the horses – it was only then that Rick could calm himself and get to sleep.

Horses have always been a source of comfort for Mr. Dane.  He had been around them since he was in diapers, accompanying his father to the racetrack every night and eventually, going on his own to help whatever trainer would let him.  Working with horses provided an outlet for Mr. Dane throughout his life, and he continues to pursue that passion today as he is a farrier—shoeing and grooming horses.

1

Richard Allen Dane Jr. was born on March 10, 1981, in Kettering, Ohio.[1]  His parents, Richard Dane Sr. and Lynn Bogan divorced when Mr. Dane was two years old, and his mother left the family.[2]  Since then, Mr. Dane has had little to no contact with his mother.[3]  As he got older, he reached out to her a few times but throughout his childhood, he and his siblings had no relationship with their mother.  Specifically, when he was 16 years old, he worked at Burger King and saved up to buy a car and gave it to his mother.[4]  She took the car and Mr. Dane never heard from her again.[5]  Approximately seven years ago, Mr. Dane's mother passed away.[6]

Mr. Dane has two paternal half-sisters and all three children were raised by their father.[7]  Unfortunately, Mr. Dane's father was not around a lot—he worked long hours at General Motors and often went to a bar after work to drink and struggled with alcohol abuse.  Additionally, Mr. Dane's father re-married approximately 13 times, which resulted in many step-mothers moving in and out of the family home on numerous occasions.  As a result of his alcohol abuse and many divorces, the family struggled financially.[8]  Mr. Dane has vowed to never abuse alcohol or any other drugs as a result of seeing his father struggle throughout his life.[9]

Many of Mr. Dane's step-mothers were "okay" and he was largely indifferent to their presence in his home.[10]  However, some were "horrible" and did not treat Mr. Dane and his sisters well.[11]  Mr. Dane specifically remembers one of his step-mothers, named Paula, who had a son around Mr. Dane's age.  Paula and her son moved in with Mr. Dane and his family and admittedly, Mr. Dane picked on Paula's son a bit, which Paula did not like.  Mr. Dane worked that entire summer to save up and bought new school clothes for himself and one day, Paula had gone into Mr. Dane's room and cut up all of the new clothes.  He was devastated.  But he kept it to himself, because he knew better than to tell his father, who would only end up blaming Mr. Dane.

Most notably, Mr. Dane's father married Mr. Dane's half-sister.[12]  Mr. Dane's mother had four other children and when Mr. Dane's father was 60 years old, he married Jenny, Mr. Dane's maternal half-sister, who was 19 years old at the time.[13]  Mr. Dane was furious and confused and stopped speaking with his father after this marriage.[14]

Both of Mr. Dane's older sisters, Shelly and Marney, ran away from the family home when they were approximately 13 years old, leaving a young Mr. Dane alone with their father and

---

[1] PSR ¶ 117.
[2] *Id.*
[3] *Id.*
[4] PSR ¶ 122.
[5] *Id.*
[6] PSR ¶ 117.
[7] PSR ¶¶ 119, 120.
[8] PSR ¶ 120.
[9] PSR ¶ 134.
[10] PSR ¶ 120.
[11] *Id.*
[12] PSR ¶ 124.
[13] *Id.*
[14] *Id.*

various step-mothers.  Mr. Dane's father never physically abused the children, he was mentally abusive and very controlling, especially with Mr. Dane's sisters.  When his sisters left, Mr. Dane felt alone and abandoned and, although he was never very close with his sisters, their absence greatly affected him.

Mr. Dane had a cousin, William Scott Dane, who he was very close with.  The two were more like brothers and would do anything to help each other.[15]  Recently, Scott Dane was going through a difficult time financially as a single father to four daughters and had mentioned to Mr. Dane that he was going to go to his parents' house to grab some groceries since he could not afford to shop at the store.[16]  When Scott Dane returned home, he saw that Mr. Dane had groceries delivered to his house – "it meant a lot…because I did not ask him to do it nor did he need to do it, he did it out of the kindness of his heart.[17]

In his early teens, Mr. Dane moved in with his paternal grandmother, Pauline Dane, and his paternal grandfather, William Dane.[18]  His grandparents took him in and helped raise him because his father was incapable of caring for him.[19]  He would always help his grandparents with their yard work and household chores and he felt loved and cared for when he was with his grandparents.[20]  Mr. Dane remained close with them throughout his life, until they passed away approximately 15 years ago.

While in school, Mr. Dane played a number of sports, including baseball, basketball and football.[21]  He also never failed any of his classes and maintained a B to C average.  However, his family did not encourage his academic career and did not consider it to be very important and Mr. Dane dropped out of school in the 10th grade to pursue training racehorses.  Mr. Dane would go to the local racetrack almost every night and the trainers got to know him.  When he was 16 years old, someone from the track offered Mr. Dane four horses to train in Toledo, Ohio, in exchange for $1000 a month.  Mr. Dane moved to Toledo and began to train these horses; however, he was never paid.  After approximately five months, Mr. Dane's uncle came to pick him up – Mr. Dane was scrounging together coins he found in the barn or on the track to grab some food from vending machines and he was having trouble feeding the horses because he had no money.

This was a frustrating experience for an impressionable Mr. Dane but it did not deter him from continuing to pursue his dream of becoming a horse trainer.  After he moved back home, he worked for a couple local trainers until he was 18 years old.  Around this time, he met Kelly Kennard, who was from Illinois and also trained horses.[22]  The two married and moved to Illinois to train at Balmoral Park Racetrack.  She had two children and they were all living in a one room dorm at the track.  Mr. Dane and Ms. Kennard separated after 4 months of marriage because Mr.

---

[15] Exhibit A – Letter from William Scott Dane.
[16] *Id.*
[17] *Id.*
[18] PSR ¶ 121.
[19] *Id.*
[20] Exhibit B – Letter from William M. Dane, Jr. and Karen Sue Dane.
[21] PSR ¶122.
[22] PSR ¶125.

Dane caught her cheating on him.[23]  They did not officially divorce until approximately 1993, because Mr. Dane did not have the money to file for divorce at the time.

Mr. Dane continued to work with horses, mostly in Illinois, but expanded his career into Pennsylvania, New Jersey, and New York.  After his relationship with Ms. Kennard ended, he met Kimberly Roth while working at the track in Illinois.  Although they never married, Mr. Dane and Ms. Roth were in a relationship for 16 years and had a son together, Evan Dane, who is now 19 years old.[24]  Mr. Dane is extremely proud of his son.  Evan recently took the test to get into the United States Air Force and was always a great student.  Mr. Dane always provided for his son and wanted to make sure that Evan was cared for financially and emotionally.[25]  He knew what it was like to grow up without a strong and positive father figure in his life and he did not want his son to experience the same hardships that he did.  Mr. Dane and Ms. Roth separated when Mr. Dane moved to New York and Ms. Roth could not leave her elderly parents in Illinois.[26]  They separated amicably and remain friends to this day.  Indeed, Ms. Roth, Mr. Dane's ex-partner, wrote:

> "I know most partners end things as enemies.  But we remain friends Today.  I am writing on Rick's behalf, to tell you how he has helped so many people that were down on their luck.  He would shoe people's horses for free because he knew they were broke and the horse needed to be done.  Shipped people's horses because they couldn't afford to pay for shipping the horse.  He's given old friends a couch to sleep on until they get back on their feet.  I remember a woman working at the farm, her husband left her and her 2 girls with no vehicle.  So Rick bought her a cheap car so she could work and take care of her girls.
>
> Rick has always tried to help people."[27]

Mr. Dane also has a daughter, Kayla Ross, who is currently 31 years old.[28]  However, Mr. Dane was unaware of Ms. Ross' existence until he was arrested in 1999 and notified by the court that his child support was in arrears.[29]  After finding out that he had a child, Mr. Dane and his lawyer reached out to the mother and they agreed to meet on Easter Sunday.  Mr. Dane did not meet his daughter until she was eight years old but from that moment on, he "stepped up…[and] has done nothing but show support for [his daughter] and everything [she] ever wanted to do.[30]  He recognized the mother as Danita Ross, a woman he had met one time at a party.[31]  Mr. Dane and Ms. Ross agreed that Mr. Dane would not file for custody and would travel to Ohio twice a

---

[23] *Id.*
[24] PSR ¶ 128.
[25] *See* Exhibit C – Letter from Evan Dane.
[26] PSR ¶ 128.
[27] Exhibit M-Letter from Kimberly Roth.
[28] PSR ¶ 127.
[29] *Id.*
[30] *Id*; *see also* Exhibit D - Letter from Kayla Hubbard.
[31] PSR ¶ 127.

4

month to spend time with his daughter, and he became up to date on his child support payments.[32] This continued until Kayla was 14 years old, when she called Mr. Dane one night crying after getting into a fight with her mother, who was drunk and on drugs. Mr. Dane immediately drove to Ohio and he and Ms. Ross agreed that Kayla would move in with Mr. Dane until Ms. Ross could get better. Kayla lived with Mr. Dane until she was 18 years old and moved back to Ohio to be closer to her friends. Mr. Dane and Kayla are still very close. Kayla is now married with two children and Mr. Dane is thrilled to be a grandfather.[33] He is very close with his granddaughters and "has grown to be an absolutely essential part" of their lives.[34]

Following his relationship with Ms. Roth, Mr. Dane was in a 10-year relationship with Monica Eriksen. They lived in New York together and were partners on some horses. Ms. Eriksen had two children, Emily and Richie. Mr. Dane treated Emily and Richie like his own children and helped raise them.[35] He provided them with parental guidance and advice and was always there if they needed him.[36] Their biological father was also present in their lives and all of the parents got along great, resulting in the children growing up with four adults who all loved them and supported them. After his arrest in this case, Mr. Dane and Ms. Eriksen split up but remain friends. Mr. Dane is devastated that he is no longer present in Emily and Richie's lives on a day-to-day basis and although he has tried to maintain a relationship with them, Emily is mad at Mr. Dane and blames him for leaving.

Mr. Dane is currently in a relationship with Aleah Balzano, and the two live together in New York.[37] They have been together for approximately one year and Ms. Balzano is aware of Mr. Dane's legal case and very supportive of him.[38] They met at a farm that Ms. Balzano was managing and she saw him interact with the horses and the people at the barn and saw a safe and respectable man.[39] He has helped her in many ways and she will be there for him no matter what.[40]

Since he was 16 years old, Mr. Dane has worked with at various tracks as a farrier and horse trainer.[41] He loves working with horses and is passionate about his career. Mr. Dane always put the horses before himself and worked hard to ensure that his horses were cared for.[42] He is patient and caring with the animals and is a "reliable, punctual, and easy [person] to work with."[43] He understands that his actions that resulted in his arrest in this case placed his career and his future in jeopardy and he is remorseful for his conduct. Mr. Dane is a "very kind and generous man" and has a strong support system in Ohio who will provide him with housing or a job if he

---

[32] *Id.*

[33] *Id.*

[34] Exhibit D

[35] Exhibit E – Letter from Monica Eriksen; *see also* Exhibit F – Letter from Emily Banca.

[36] Exhibit G – Letter from Richard M. Banca.

[37] PSR ¶ 129.

[38] *Id.*

[39] Exhibit H – Letter from Aleah Balzano.

[40] *Id.*

[41] PSR ¶¶ 137, 138.

[42] Exhibit I – Letter from Richard Dorsch.

[43] Exhibit J – Letter from Karie Boniface.

ever needs it.[44]  He loves his children and does not want to be separated from them and uses them as motivation to continue to be a productive member of society and show his family that he is not the man portrayed in this case.[45]  He is responsible and works very hard to provide for himself and his family, who mean everything to him.[46]

Mr. Dane was arrested in California after coming back from a vacation with his young son. As they got off a plane, federal agents approached and arrested Mr. Dane on the instant case.  Mr. Dane's son was placed into children's services and remained there until Mr. Dane could provide them with a credit card so that they could purchase a return flight to his mother who lived in Chicago.  Mr. Dane was ultimately released by a District Court in California after his arrest.  As part of the initial release conditions, he could not work with horses.  He then joined Instacart/ DoorDash and delivered meals to make money.  After the conditions of release were modified to allow him to work on a farm and have contact with horses, he immediately returned to a horse barn cleaning stalls and shoeing horses.  He is now a farrier/ horse shoer which is regarded as one of the worst jobs on the farm.  His clients are spread out and he sometimes spends hours doing intense and backbreaking work—and he would not trade a single day as a farrier for his previous life as a horse trainer.  Mr. Dane feels relief that his life as a horse trainer is over.

## What is the appropriate sentence for Rick Dane?

In its Presentence Report, the Department of Probation wrote: "our presentence investigation did not yield any information suggesting that the defendant is [a] sadistic animal abuser; to the contrary, Dane appears to care for the wellbeing of animals.  Regarding culpability, if each defendant's forfeiture stipulations are an accurate measure of personal gain, Dane appears to rank near the bottom in this scheme, something that may be suggestive of relatively less involvement.  These factors, coupled with the defendant's strong employment history, tight family relationships, relatively limited and non-violent criminal history,[47] are all suggestive that this conduct represents aberrant behavior for the defendant, that his recidivism risk is low, and that a guidelines term of imprisonment may be longer than necessary."[48]  As noted above, Mr. Dane's involvement in the crime clearly appears to be an aberration.  His crime appears to be brought about by desperation and because he was suffering because he could not earn enough money. Although the defense appreciates that the Department of Probation identified that Mr. Dane was at the bottom of the scheme, the defense respectfully disagrees with the assessment of this case and recommendation by the Department of Probation.

---

[44] *See* Exhibit B; Exhibit A; *see also* Exhibit K – Letter from Scott Keppler; Exhibit C.

[45] Exhibit B.

[46] Exhibit L – Letter from Shelly White.

[47] Mr. Dane fathered a child, however, he was not told that the child had been conceived or that the mother was pregnant.  The mother was not involved with Mr. Dane in a relationship and did not reside with or near Mr. Dane. The mother of the child applied for child support and a warrant for failure to pay although Mr. Dane had no knowledge of the child.  As set forth more fully above, Mr. Dane became involved in the life of his daughter after he became aware and he pleaded guilty for failing to pay support—even though he had no knowledge of the child.

[48] PSR at 37.

Additionally, since Mr. Dane pleaded guilty, he has been making donations to New Vocations—a program that rehabilitates, retrains, and rehomes retired racehorses and has placed more than 8,000 horses in adoptive homes.[49] New Vocations has facilities in Kentucky, Louisiana, New York, Ohio, and Pennsylvania.[50] Mr. Dane's average monthly donation is $500.00 which is taken from his earnings as a farrier.[51]

In fashioning the appropriate sentence, the Court's challenge is to mete out a sentence that is sufficient, but not greater than necessary. In doing so, the Court must consider the total bent of Mr. Dane's life. Again, it is our considered view that a non-guideline sentence here is sufficient, but not greater than necessary.

In *Gall v. United States*, 552 U.S. 38, 49-59 (2007), the Supreme Court held that the guidelines provide a starting point for a reasonable sentence, however, a sentencing Court "must make an individualized assessment based on the facts presented." The Court also held that the sentencing Court cannot "presume that the Guideline range is reasonable." *Id*. As a result, the sentencing Court can use the advisory guidelines to create an appropriate sentence after considering the facts enumerated in 18 U.S.C. §3553(a). That appropriate sentence may be outside the guidelines range as long as the "justification is sufficiently compelling to support the degree of the variance." *Gall*, 522 U.S. at 50. Our disagreement with the assessment of the Department of Probation is that it "presumes the Guideline is reasonable" and struggles to recommend a sentence that is tied to that structure even after reciting all of the varied reasons why a sentence of imprisonment is inappropriate for Mr. Dane. The sentencing Court is not obliged to "presume that the Guidelines range is reasonable." *Id*.

## Prison sentences do not affect general or specific deterrence.

Statistics show that in general, longer prison sentences do not affect general or specific deterrence. Studies show the "criminogenic" effect prison has--imprisonment can actually lead people to commit more crimes after release.[52] Prisons provide little rehabilitative programming and often release individuals back to society without proper support, which leaves them vulnerable and likely to turn back to crime.[53] A 2007 National Bureau of Economic Research study found that "prison stays longer than 20 months had 'close to no effect' on reducing commission of certain crimes upon release."[54] Additionally, a 2013 paper by economist David Abrams found that longer

---

[49] *See* Exhibit N-1.

[50] *Id*.

[51] *See* Exhibit N-2.

[52] *How Many Americans are Unnecessarily Incarcerated?*, 29 FED. SENT. R. 140, 141 (December 1, 2016 – February 1, 2017).

[53] *Id*.

[54] *How Many Americans are Unnecessarily Incarcerated?*, 29 FED. SENT. R. 140, 141 (December 1, 2016 – February 1, 2017); *citing* Ilyana Kuziemko, *Going off Parole: How the Elimination of Discretionary Prison Release Affects the Social Cost of Crime* 21 (Nat'l Bureau of Econ Research, Working Paper No. 13380, 2007), http://www.nber.org/papers/w13380.

sentences do not reduce recidivism more than shorter sentences.[55]  Abrams  examined the effects of sentencing and parole in three cities (Chicago, Las Vegas, and Washington, D.C.) and two states (California and Georgia) and concluded that "these studies seem to find fairly consistent evidence of specific deterrence for low sentences ranges, but not for longer ones."[56]

An analysis of over 440,000 prisoners by psychologist Paul Gendreau in 2002 also found significant diminishing returns for longer prison sentences and he concluded that after twelve (12) months, prison stays caused higher recidivism.[57]

Similarly, studies indicate that long prison sentences have little to no impact on reducing the criminal behavior of the public at large, commonly known as "general deterrence."[58]  A study by the National Academy of Sciences in 2014 conducted a comprehensive analysis of more than a dozen leading studies on general deterrence and concluded that "the evidence on the deterrent effect of sentence length suggests that the relationship between crime rate and sentence length [has] diminishing deterrent returns" at best.[59]  Proponents of longer prison sentences claim that additional time in prison exacts greater retribution and creates deterrent effects, including a specific deterrent effect that reduces recidivism.[60]  However, it is unclear exactly how specific deterrent effects of prison may unfold over varying periods of incarceration.[61]  Studies have found that "when prisoners serve longer sentences, they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism."[62]

"[L]onger prison sentences were associated with a **three percent increase** in recidivism. Offenders who spent an average of 30 months in prison had a recidivism rate of 29%, compared

---

[55] *Id.* at 154; David Abrams, *The Imprisoner's Dilemma: A Cost Benefit Approach to Incarceration*, 98 IOWA L.J. 907 (2013).

[56] Abrams, 98 IOWA L. J. at 936.

[57] 29 FED. SENT. R. at 155; Paul Gendreau et al., The Effect of Prison Sentences & Intermediate Sanctions on Recidivism: General Effects & Individual Differences (2002),  http://www.publicsafety.gc.ca/cnt/rsrcs/pblctns/ffcts-prsn-sntncs/index-eng.aspx.

[58] 29 FED. SENT. R. at 156.

[59] Jeremy Travis et al., Nat'l Research Council, The Growth of Incarceration in the United States: Exploring Causes and Consequences 139, 154 (2014).  *See also*, Daniel S. Nagin, *Deterrence in the Twenty-first Century: A Review of the Evidence*, 42 Crime and Justice: Crime and Justice in America 1975-2025 199, 231 (2013).  *See* Daniel P. Mears, et al., *Recidivism and Time Served in Prison*, 106 J. CRIM. L. & CRIMINOLOGY 81, 82-3 (2016); *see* Edward J. Latessa, et al., WHAT WORKS (AND DOESN'T) IN REDUCING RECIDIVISM, 6-7 (2014) (describing the changes in the corrections system and longer terms of incarceration).

[60] Mears, et al., 106 J. CRIM. L. & CRIMINOLOGY at 83.

[61] *Id.*; *see also* David S. Abrams, *How do we decide how long to incarcerate*?, in EMPIRICAL LEGAL ANALYSIS: ASSESSING THE PERFORMANCE OF LEGAL INSTITUTIONS, (Yun-chien Chang ed., 2014); Joshua C. Cochran et al., *Assessing the Effectiveness of Correctional Sanctions*, 30 J. QUANTITATIVE CRIMINOLOGY 317, 318 (2014) (reviewing prior literature on the uncertain effects of variable amounts of time served in prison); Thomas Orsagh & Jong Rong Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, 4 J. QUANTITATIVE CRIMINOLOGY 155 (1988) (describing the time served-recidivism relationship).

[62] Thomas Orsagh & Jong-Rong Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, 4 J. QUANTITATIVE CRIMINOLOGY 155 (1988).

to a 26% rate among prisoners serving an average sentence of 12.9 months."[63]    Additionally, despite the marked increase in incarceration in recent decades, "there is no evidence that recidivism rates have improved."[64]

## **CONCLUSION**

Even at a time when sentencing Courts were bound by a mandatory Guideline sentencing structure, the Supreme Court wrote that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed. 2d 392 (1996).  The defense would respectfully urge this Court to impose a sentence that is below the guidelines due to the extraordinary mitigation present in Mr. Dane's life.  The United States Court of Appeals for the Second Circuit wrote in *United States v. Jones*, 460 F.3d 191, 194, (2006) that "[a]lthough the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553 (a), the judge is not prohibited from including in that consideration the judge's sense of what is a fair and just sentence under all circumstances."  The defense respectfully submits that while the Court must make a determination that takes the guidelines into account, the Court is not prohibited from looking at the facts and circumstances of Mr. Dane's particular set of circumstances and fashioning a reasonable sentence that is individualized and sufficient, but not greater than necessary to accomplish the goals of sentencing.

---

[63] Valerie Wright, Ph.D, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, THE SENTENCING PROJECT 6 (2010), https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf.

[64] *Id.* at 86.

DATED:      New York, New York
                August 26, 2022

                                        Respectfully submitted,

                                        By:     /s/ Calvin H. Scholar
                                                *Attorney for Rick Dane, Jr.*
                                                The C.H. Scholar Law Firm, P.L.L.C.
                                                225 Broadway, Suite 715
                                                New York, New York 10007
                                                Telephone: (212) 323-6922
                                                Facsimile: (212) 323-6923

TO:

The Honorable Mary Kay Vyskocil
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

10